# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **RONALD K. HOOKS**, Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>                    Petitioner,<br><br>     v.<br><br>**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 8**; **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 40**; and **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**,<br><br>                    Respondents. | Case No.: 3:12-cv-01691-SI<br><br><br><br><br>**OPINION AND ORDER** |

Anne P. Pomerantz and Mara-Louise Anzalone, National Labor Relations Board, Region 19, 915 Second Avenue, Room 2948, Seattle, Washington 98174; Lisa J. Dunn, National Labor Relations Board, Subregion 36, 601 SW Second Avenue, Suite 1910, Portland, Oregon 97204. Attorneys for Petitioner.

Robert Remar and Eleanor Morton, Leonard Carder, LLP, 1188 Franklin St. #201, San Francisco, California 94109; Robert Lavitt, Schwerin, Campbell, Barnard, Iglitzin and Lavitt, LLP, 18 West Mercer Street, Suite 400, Seattle, Washington 98119-3871. Attorneys for Respondents.

**SIMON, District Judge**.

        This action arises from a dispute at Terminal 6 at the Port of Portland concerning the work of plugging in, unplugging, and monitoring refrigerated shipping containers (the "reefer work"). The International Longshore and Warehouse Union ("ILWU") and the Pacific Maritime Association ("PMA") contend that their collective bargaining agreement—the Pacific Coast

Longshore Contract Document ("PCLCD")—requires ICTSI Oregon, Inc. ("ICTSI"), the

operator of Terminal 6 and a PMA member, to assign the reefer work to ILWU members. ICTSI,

the Port of Portland (the "Port"), and the International Brotherhood of Electrical Workers

("IBEW") Local 48 contend that other contracts—including the Terminal 6 Lease Agreement

between the Port and ICTSI and the District Council of Trade Unions Agreement between the

Port and IBEW—require that the reefer work be assigned to IBEW members. On August 13,

2012, a three-member panel of the National Labor Relations Board (the "NLRB") issued a

decision pursuant to § 10(k) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(k),

concluding that employees represented by IBEW are entitled to perform the reefer work. *Int'l

Bhd. of Elec. Workers*, 358 NLRB No. 102, 2012 WL 3306478 (Aug. 13, 2012).

Several shipping companies that call on the Port of Portland (the "Carriers") are members

of PMA, and, as such, are parties to the PCLCD. Notwithstanding the NLRB's § 10(k) decision,

ILWU, ILWU Local 8, and ILWU Local 40 (collectively "Respondents") have continued to file

and process lost work opportunity grievances against the Carriers, seeking lost wages for reefer

work assigned to IBEW members. In addition, ILWU has not withdrawn its claim made under

§ 301 of the Labor-Management Relations Act against ICTSI in *Int'l Longshore & Warehouse

Union v. ICTSI Oregon, Inc.,* Case No. 3:12-cv-01058-SI (D. Or.) (the "§ 301 claim"), a related

action pending in this Court. In its § 301 claim, ILWU asks this Court to confirm arbitration

awards made pursuant to the PCLCD that require ICTSI to assign the reefer work to ILWU

members.

In response to Respondents' refusal to withdraw their § 301 claim and their continued

pursuit of grievances against the Carriers, ICTSI filed two unfair labor practice charges with

Petitioner Ronald K. Hooks, the Regional Director of the Nineteenth Region of the NLRB

("Petitioner"). Petitioner consolidated ICTSI's charges and issued an administrative complaint against Respondents. The administrative complaint alleges that Respondents are violating §§ 8(b)(4)(ii)(B) and (D) of the NLRA by continuing to pursue their § 301 claim and lost work opportunity grievances after the NLRB's § 10(k) decision awarded the reefer work to IBEW members. This administrative complaint is pending before the adjudicatory section of the NLRB.[1]

Before the Court is Petitioner's petition for a preliminary injunction pursuant to § 10(l) of the NLRA, 29 U.S.C. § 160(l). Dkt. 1. Petitioner seeks to enjoin Respondents from pursuing grievances against ICTSI and the Carriers and maintaining their § 301 claim against ICTSI pending the NLRB's final decision on Petitioner's unfair labor practice charges. For the reasons discussed below, the Court finds that Petitioner has satisfied the criteria for a preliminary injunction. Accordingly, as described more fully below, the Court preliminarily enjoins Respondents from filing lost work opportunity grievances against ICTSI or the Carriers pending the NLRB's final decision.[2] In addition, the Court will stay ILWU's § 301 claim in the pending case *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.,* Case No. 3:12-cv-01058-SI (D. Or.).

---

[1] The NLRB has separate adjudicatory and prosecutorial sections. The NLRB, consisting of five board members appointed by the president to five-year terms, controls the adjudicatory functions of the NLRB. The NLRB's General Counsel, who is appointed by the president to a four-year term, leads the prosecutorial section. The result is "a single enforcement agency with authority divided between two independent units." J. Higgins, THE DEVELOPING LABOR LAW 2656-57 (5th ed. 2006); 29 U.S.C. § 153. Petitioner's complaint is brought under the authority of the General Counsel. 29 U.S.C. § 153(d).

[2] Preliminary injunctions "that are issued under Section . . . 10(l) normally expire upon issuance of [an NLRB] decision in the underlying case." Higgins at 2742. The NLRB's decision will be appealable to United State Court of Appeals in either the Ninth Circuit or the District of Columbia Circuit. 29 U.S.C. § 160(f).

# BACKGROUND

## A.    The Parties

PMA is a multi-employer collective bargaining association whose members include stevedoring companies, terminal operators, and shipping companies. Dkt. 2-2 at 136-37. The Carriers, who are members of PMA, include Cosco North America, Inc., Hamburg Sud North America, Inc., Hanjin Shipping America, LLC, Hapag Lloyd America, Inc., "K" Line America, Inc., and Yang Ming America Corporation. *See, e.g.*, Dkt. 2-2 at 18 and 60; Dkt. 2-3 at ¶ 5. Respondents are labor organizations. Dkt. 2-2 at 136.

ILWU and PMA are party to a collective bargaining agreement known as the PCLCD.[3] The PCLCD governs the terms and employment of all ILWU longshore workers employed by PMA member companies. Under Section 1 of the PCLCD, ILWU members appear to be entitled to perform the reefer work at ports along the West Coast, including the Port of Portland. Dkt. 2-2 at 161. The PCLCD contains a grievance and arbitration procedure for resolving disputes arising under the PCLCD. *See* Dkt. 2-2 at 165-84; *see also Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union, Local 8*, 3:12-cv-1100-SI, 2012 WL 2994062 (D. Or. July 20, 2012) (discussing PCLCD grievance and arbitration procedures).

The Port is not a member of PMA and is not party to the PCLCD. IBEW is also not a party to the PCLCD. The Port and IBEW, however, are parties to their own collective bargaining

---

[3]  The PCLCD covers work performed by ILWU Local 8 longshore workers. PMA and ILWU are also party to a collective bargaining agreement called the Pacific Coast Clerks Contract Document ("PCCCD"), which covers work performed by ILWU Local 40 clerks. Together, the two collective bargaining agreements are known as the "Pacific Coast Longshore and Clerks Agreement." The bulk of the grievances described in this Opinion are made pursuant to the PCLCD by ILWU Local 8. Nonetheless, ILWU Local 40 has filed at least one grievance under the PCCCD related to reefer work. Dkt. 2-2 at 121.

agreement, known as the District Council of Trade Unions Agreement ("DCTU Agreement"). Under the DCTU Agreement, IBEW-represented employees are entitled to perform the reefer work at Terminal 6 and have done so since 1974. *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *1.

ICTSI is a cargo handling company. Petition for Preliminary Injunctive Relief ("Pet.") at ¶ 8(a) (Dkt. 1). In 2011, ICTSI entered into a 25-year lease with the Port to operate Terminal 6 at the Port of Portland. *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *1. Although ICTSI is not a signatory to the DCTU Agreement, the Terminal 6 Lease provides that ICTSI may not "undertake any action that would cause the Port to be in violation of the terms of the DCTU Agreement." *Id.* at *2 (quoting Terminal 6 Lease Agreement). Shortly after ICTSI entered into the Terminal 6 Lease, it joined PMA. As a member of PMA, ICTSI became bound by the PCLCD. *Id.* Even though ICTSI is party to the PCLCD, the Port, IBEW, and ICTSI contend that the DCTU Agreement and the Terminal 6 Lease require ICTSI to use IBEW-represented employees to perform the reefer work on Terminal 6. When it began operating Terminal 6, ICTSI used IBEW members to perform reefer work on Terminal 6.

**B.    The § 10(k) Decision**

In early 2012, pursuant to the PCLCD's grievance procedures, Respondents began to file "lost work opportunity" grievances against ICTSI and the Carriers. *See, e.g.,* Dkt. 2-2 at 9, 12-20. These grievances allege that ICTSI and the Carriers are inappropriately contracting non-ILWU members (*i.e.,* IBEW members) to perform the reefer work, in violation of Section 1 of the PCLCD. In June, pursuant to the PCLCD's arbitration provisions, an arbitrator issued two decisions directing ICTSI to assign the reefer work to ILWU members. Dkt. 2-2 at 191, 196-97. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, provides United States

District Courts with jurisdiction to enforce final and binding arbitration awards. *Gen. Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963) (per curiam). ILWU brought an action pursuant to § 301—the "§ 301 claim," described above—to enforce these arbitration awards. Dkt. 2-2 at 135-47; *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.,* Case No. 3:12-cv-01058-SI (D. Or.).

In response to Respondents' grievances, in May 2012, IBEW threatened to picket if ICTSI assigned the reefer work to ILWU members. *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *4. ICTSI filed unfair labor practice charges against IBEW with the NLRB. *Id.* at *1. ILWU Local 8 intervened in the case, and the NLRB held a § 10(k) proceeding. "A § 10(k) proceeding is a hearing conducted by the NLRB subsequent to a § 8(b)(4)(ii)(D) claim to determine which union has the superior claim to 'work in dispute.'" *Miron Constr. Co., Inc. v. Int'l Union of Operating Eng'rs, Local 139*, 44 F.3d 558, 561 n.11 (7th Cir. 1995).

On August 13, 2012, the NLRB issued a § 10(k) decision that awarded the reefer work to the members of IBEW. In its decision, the NLRB noted that both "IBEW and ILWU are party to collective-bargaining agreements that cover the disputed work." *Id.* at *5. Under the PCLCD, ICTSI is bound to assign the reefer work to ILWU members. *Id.* Under the DCTU Agreement, the Port is bound to assign the reefer work to IBEW members. *Id.* After considering a variety of factors, including the provisions of the applicable collective bargaining agreements, employer preference, past practice, area and industry practice, relative skills and training, and economy and efficiency of operations, the NLRB concluded "that employees represented by IBEW are entitled to perform the work in dispute." *Id.* at *7.

**C.      Respondents' Conduct After the § 10(k) Decision**

The NLRB's § 10(k) decision awarded the reefer work to IBEW members. Nonetheless, according to Petitioner, Respondents have engaged in three courses of conduct since the § 10(k) decision that are unfair labor practices in violation of the NLRA. First, ILWU has continued to maintain its § 301 claim in *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.,* Case No. 3:12-cv-01058-SI (D. Or.). Pet. at ¶ 8(s). Second, Respondents have filed dozens of lost work opportunity grievances against the Carriers.[4] Pet. at ¶ 8(r) and (t). These grievances seek payment of lost wages from the Carriers because ILWU "mechanics were not hired" to perform the reefer work at issue. Dkt. 2-2 at 64-119; Dkts. 19-1, 19-2. Third, Respondents have maintained outstanding lost work opportunity grievances and filed new lost work opportunity grievances against ICTSI. Pet. at ¶ 8(r). At oral argument, counsel for Respondents represented that ILWU has withdrawn all outstanding grievances against ICTSI. *See also* Dkt. 19-2 at 3.

## D.    Petitioner's Administrative Complaint Against Respondents

On August 17 and 22, 2012, ICTSI filed two new charges with Petitioner, alleging that Respondents are engaging in additional unfair labor practices. Pet. at ¶ 3. Petitioner consolidated the charges and issued an administrative complaint with the NLRB against Respondents, alleging that Respondents are violating §§ 8(b)(4)(ii)(B) and (D) of the NLRA. Dkt. 2-3; *see also* 29 C.F.R. § 101.8 (governing issuance of unfair labor practice complaints). Pursuant to the NLRA and the NLRB's rules and regulations, an administrative law judge ("ALJ") will hold a hearing on Petitioner's administrative complaint and issue a decision. 29 C.F.R. §§ 101.10 and 101.11. Petitioner, ICTSI, and Respondents will have an opportunity to appeal the ALJ's decision to the members of the NLRB. *Id.* at § 101.12. If any party disagrees with the NLRB's decision, that

---

[4]  Petitioner also alleges that Respondents have "threatened" the Carriers by sending them letters stating that Respondents' would prosecute lost work opportunity grievances against the Carriers. Pet. at ¶ 8(t); *see* Dkt. 2-2 at 206-16.

party may appeal the NLRB's decision to the United State Court of Appeals for the Ninth Circuit or the District of Columbia Circuit. *Id.* at § 101.14; 29 U.S.C. § 160(f). This Court does not have jurisdiction to hear Petitioner's administrative complaint and will not ultimately decide any of the unfair labor practice claims raised in the administrative complaint. This Court also will not review the NLRB's decision. *Walsh v. Int'l Longshoremen's Ass'n, AFL-CIO, Local 799*, 630 F.2d 864, 868 (1st Cir. 1980) ("The limited effect of a section 10(l) decision flows naturally from the limited role of the district court in hearing the petition. The [district] court does not decide whether an unfair labor practice has occurred; that decision is for the Board, subject to review by the court of appeals."). Section 10(l) of the NLRA, however, grants this Court jurisdiction to issue preliminary injunctive relief pending the NLRB's final decision on Petitioner's administrative complaint. 29 U.S.C. § 160(l).

## STANDARDS FOR PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id*. at 20. A district court in the Ninth Circuit must apply the *Winter* elements to requests for § 10(l) preliminary injunctions. *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200, AFL-CIO*, 611 F.3d 483, 489-90 (9th Cir. 2010).

The Supreme Court's decision in *Winter*, however, did not entirely displace the Ninth Circuit's "sliding scale" approach to preliminary injunctions. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, "a stronger showing of one

element may offset a weaker showing of another." *Id.* Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips *sharply* in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 663 F.3d 1100, 1108 (9th Cir.2011) (emphasis added); *see also Alliance for the Wild Rockies*, 632 F.3d at 1132.

## DISCUSSION

Petitioner seeks a § 10(l) preliminary injunction enjoining "Respondents from: (a) threatening or coercing ICTSI and others; (b) filing, maintaining and/or processing grievances against ICTSI that seek any relief inconsistent with the 10(k) Award; and (c) maintaining their legal action in *ILWU and PMA v. ICTSI Oregon, Inc.*, Case No. 3:12-cv-01058-SI, in each case with the dual objects of forcing the assignment of certain work to Respondent Local 8 and/or Respondent Local 40, in violation of § 8(b)(4)(ii)(B) and § 8(b)(4)(ii)(D) of the Act." Mem. of P. & A. at 9 (Dkt. 2). As discussed below, the Court finds that Petitioner meets each of the four *Winter* elements.

**A.      Likelihood of Success on the Merits**

The first *Winter* element requires Petitioner to demonstrate that he is likely to succeed on the merits of his claims. Petitioner's administrative complaint raises two claims. First, Petitioner alleges that Respondents have violated § 8(b)(4)(ii)(B) of the NLRA by unlawfully attempting to cause ICTSI and the Carriers to cease doing business with the Port. Dkt. 2-3 at ¶¶ 12, 14. Second, Petitioner alleges that Respondents have violated § 8(b)(4)(ii)(D) of the NLRA by unlawfully attempting to cause the Port and ICTSI to re-assign the reefer work to their members, in contravention to the NLRB's August 13, 2012, § 10(k) decision awarding the reefer work to IBEW members. Dkt. 2-3 at ¶¶ 13-14. Because the Court finds that analysis of Petitioner's

§ 8(b)(4)(ii)(D) claim bears on Petitioner's § 8(b)(4)(ii)(B) claim, the Court begins with the

§ 8(b)(4)(ii)(D) claim.

**1.      § 8(b)(4)(ii)(D)**

Congress "intended to make the section 10(k) proceeding the peaceful and binding final

determination of a disputed work assignment[.]" *Int'l Longshoremen's & Warehousemen's*

*Union, Local 32 v. Pac. Mar. Ass'n*, 773 F.2d 1012, 1020 (9th Cir. 1985) (internal quotation

marks and citation omitted). As such, Section 10(k) awards "take precedence" over inconsistent

arbitration awards. *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 272 (1964). "To effectuate

the purposes of [§] 10(k), it is essential that once an NLRB order becomes final, no court—state

or federal—be permitted to impair compliance with it." *Associated Gen. Contractors of Am.,*

*Inc., Oregon-Columbia Chapter v. Int'l Union of Operating Eng'rs, Local 701*, 529 F.2d 1395,

1397 (9th Cir. 1976).

Section 8(b)(4)(ii)(D) provides that it is an unfair labor practice for a union to "threaten,

coerce, or restrain any person engaged in commerce" with the object of forcing or requiring "any

employer to assign particular work to employees in a particular labor organization . . . rather than

to employees in another labor organization[.]" 29 U.S.C. § 158(b)(4)(ii)(D). After the NLRB has

issued a § 10(k) decision resolving a disputed work assignment, it is a violation of

§ 8(b)(4)(ii)(D) for the losing union to file lost work opportunity grievances or § 301 claims that

have the object of undermining the § 10(k) award. *Int'l Longshoremen's & Warehousemen's*

*Union, Local 32*, 773 F.2d at 1015 ("The union's attempt to obtain payment for work to which it

is not entitled would, if successful, completely undermine the section 10(k) work assignment.");

*Local 30, United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, AFL-*

*CIO v. N.L.R.B.*, 1 F.3d 1419, 1426 (3d Cir. 1993) ("the pursuit of a section 301 breach of

contract suit that directly conflicts with a section 10(k) determination has an illegal objective and is enjoinable as an unfair labor practice under section 8(b)(4)(ii)(D)"); *Sheet Metal Workers Int'l Assoc.*, 357 NLRB No. 131, 2011 WL 6120725 (Dec. 8, 2011) ("It is well established that a union's lawsuit to obtain work awarded by the NLRB under Section 10(k) to a different group of employees, or monetary damages in lieu of the work, has an illegal objective . . . and violates Section 8(b)(4)(ii)(D).").

Given this well-established precedent, the NLRB is likely to determine that Respondents' claims against ICTSI—both the § 301 claim and any pending lost work opportunity grievances made under the PCLCD—violate § 8(b)(4)(ii)(D). With respect to the § 301 claim, the NLRB's § 10(k) decision awarding the reefer work to IBEW-represented employees takes precedence over the conflicting arbitration awards requiring ICTSI to assign the reefer work to ILWU-represented employees. Accordingly, the NLRB is likely to find that Respondents have violated § 8(b)(4)(ii)(D) by refusing to withdraw the § 301 claim. Respondents do not disagree.[5]

Respondents represented at oral argument that they have withdrawn all lost work opportunity grievances pending against ICTSI. *See also* Dkt. 19-2 at 3. Nonetheless, if Respondents were to file a new lost work opportunity grievance against ICTSI demanding wages for hours worked by IBEW-represented employees performing reefer work, the NLRB would

---

[5] Respondents explain that they are maintaining their § 301 claim in order to perfect an appeal of the § 10(k) decision: "Since issuance of the NLRB's § 10(k) ruling, Respondent ILWU has not withdrawn its pending lawsuit against ICTSI in *ILWU/PMA v. ICTSI*, Case No. 3:12-cv-01058-SI, which seeks judicial enforcement of CLRC and arbitration rulings requiring ICTSI to assign the reefer work to ILWU mechanics. This is because the statutory scheme of § 10(k) and 8(b)(4)(D) require such refusal in order to perfect an appeal challenging the merits of the NLRB's § 10(k) award, which appeal ILWU is seeking." Opp'n to Pet. at 3-4 (Dkt. 21). To obtain review of a § 10(k) decision, "a party must fail to comply, thereby precipitating an 'unfair labor practice' proceeding in which the § 10(k) award becomes important evidence. When that proceeding culminates, as it must, in a final order, the disappointed party can bring the order into court and challenge the underlying § 10(k) determination." *J.F. White Contracting Co. v. Local 103 Int'l Bhd. of Elec. Workers*, 890 F.2d 528, 531 (1st Cir. 1989).

likely find that such a grievance violates § 8(b)(4)(ii)(D). *See Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local No. 433*, 308 NLRB No. 105, 1992 WL 230507 (Sept. 10, 1992) (union's filing of time-in-lieu grievances against employer after § 10(k) decision awarded disputed work to another union violated § 8(b)(4)(ii)(D)). Thus, the Court finds that Petitioner is likely to succeed on his claim in his administrative complaint with respect to Respondents' § 301 claim and potential grievances against ICTSI.

Respondents' grievances against the Carriers present a more difficult question. Respondents argue that their grievances against the Carriers do not violate § 8(b)(4)(ii)(D) because they do not undermine the § 10(k) award. Respondents contend that the grievances against the Carriers seek "money damages . . . for subcontracting out the reefer work to non-unit personnel[.]" Opp'n to Pet. at 11. As such, Respondents contend, their grievances against the Carriers do "not conflict with the NLRB's § 10(k) award[.]" *Id.*

Respondents' argument is grounded in a line of cases beginning with *Associated General Contractors of America, Inc., Oregon-Columbia Chapter v. International Union of Operating Engineers, Local 701*, 529 F.2d 1395 (9th Cir. 1976) ("*AGC*"). Associated General Contractors ("AGC") was a multi-employer collective bargaining association. AGC and the International Union of Operating Engineers, Local 701 ("Local 701") were parties to a collective bargaining agreement ("CBA"). The CBA provided that AGC-member companies were to use Local 701 members to operate concrete pumps. The CBA also provided that AGC members were prohibited from subcontracting any work to a subcontractor that was not also a party to the AGC-Local 701 CBA.

Pump-con was a concrete pumping company. Pump-con was not a member of AGC or a signatory to the AGC-Local 701 CBA. Pump-con was, however, a member of another multi-

employer group known as the Northwest Concrete Pumping Association ("Northwest").
Northwest was party to a different CBA with the Teamsters Union. The Northwest-Teamsters
CBA provided that the operation of concrete pumps was to be performed by members of the
Teamsters.

An AGC member, Western-Pacific, subcontracted a concrete pumping job to Pump-con.
Pump-con then employed a Teamster member to operate a concrete pump. In response, Local
701 filed a grievance, pursuant to the AGC-Local 701 CBA. A "Board of Adjustment, as
provided in the AGC-Local 701 agreement, heard the grievance and ruled that the disputed work
was to be performed by a member of Local 701." *Id.* at 1396. The Teamsters threatened to strike,
and Western-Pacific filed an unfair labor practice charge with the NLRB.

In a § 10(k) decision, the NLRB awarded the concrete pumping work to the Teamsters.
"In addition, at the request of Northwest, the NLRB expanded the scope of its order to cover all
situations in which members of the Northwest performed concrete pumping work for AGC
contractors." *Id.* Despite this ruling, Local 701 "continued to file grievances against AGC
members who subcontracted pumping work to members of Northwest. In essence, Local 701
maintained that the NLRB [§ 10(k)] order, while requiring members of Northwest to use
Teamsters members on their concrete pumps, did not relieve AGC members of their obligations
under the collective bargaining agreement to subcontract with signatories of the AGC-Local 701
agreement and thus, by implication, not to contract with members of Northwest." *Id.*

The Ninth Circuit agreed with Local 701 that despite the § 10(k) award, they could
pursue their grievances against AGC members who subcontracted pumping work to companies
that were not party to the AGC-Local 701 CBA. The Ninth Circuit noted that Local 701's
grievances did not seek to compel Northwest to use Local 701 members to operate the concrete

pumps. Instead, Local 701's grievances sought money damages from AGC members who

breached the subcontracting clause in the AGC-Local 701 CBA. The Ninth Circuit explained:

> If Local 701 were suing Northwest to compel it to use members of Local 701
> rather than Teamsters to operate concrete pumps, it is clear that the NLRB [§ 10(k)] order
> would preclude relief in this court. . . . If Local 701 were suing Northwest for damages, it
> is arguable that the court would be required to abstain. . . . In both hypothetical situations
> a judgment in favor of the union which lost before the NLRB could place the employer
> 'between the devil and the deep blue,' . . . forced either to violate the NLRB's order or
> the court's decree.

*Id.* at 1397 (internal citations omitted). Local 701's grievances, however, avoided those

problems. AGC members could comply with both the § 10(k) decision and the AGC-Local 701

CBA by subcontracting only to employers who were parties to the AGC-Local 701 CBA. Thus,

Local 701's grievances did not place AGC members "between the devil and the deep blue":

> If AGC members used only subcontractors signatory to the AGC-Local 701 [CBA] . . .
> they would fulfill their contractual obligations to Local 701 under the [CBA] without at
> the same time violating the NLRB order. . . . [T]here is no legal obligation upon an AGC
> member to contract with a member of Northwest. . . . It is the making of such a
> subcontract which breaches the AGC-Local 701 contract. In such a case, because of the
> NLRB decision, Local 701 cannot force the employment of its members on the job. The
> Board's decision does, to that extent, preempt the AGC-Local 701 agreement. But this
> does not mean that Local 701 cannot get damages for the breach.

*Id.* at 1398.

Several other courts and the NLRB itself have applied this reasoning in similar

circumstances. *See Hutter Constr. Co. v. Int'l Union of Operating Eng'rs, Local 139, AFL-CIO*,

862 F.2d 641, 642 (7th Cir. 1988); *Miron Constr. Co., Inc. v. Int'l Union of Operating Eng'rs,*

*Local 139*, 44 F.3d 558, 563 (7th Cir. 1995); *Carpenters Local 33(AGC of Mass.)*, 289 NLRB

No. 167, 1988 WL 213975 (July 29, 1988). Each of these cases shares three crucial

characteristics. First, in each case, the complaining union was party to a CBA with a general

contractor. That CBA contained a clause that proscribed the general contractor from

subcontracting work to employers that were not also parties to the CBA. Second, in each case, the general contractor violated that subcontracting provision of the CBA by subcontracting work to a non-signatory subcontractor. Third, in each case, the union's grievance against the general contractor did not seek to compel the subcontractor to assign the disputed work to the union's members but, instead, only sought money damages for breach of the subcontracting clause.

Respondents argue that *AGC* contains "a fact pattern virtually identical to the present matter." Opp'n to Pet. at 6. First, Respondents argue that the Carriers are general contractors and the PCLCD forbids the Carriers from subcontracting reefer work to "non-bargaining unit personnel." Opp'n to Pet. at 5, 13, 15-16. Second, they suggest that the Carriers have violated the PCLCD by subcontracting the reefer work to "non-bargaining unit personnel." Third, Respondents suggest that their grievances against the Carriers are intended to obtain only contract-based money damages from the Carriers, not to force the Port and ICTSI to reassign the reefer work to ILWU members. *Id.* at 21-22.

The Court, however, is unconvinced. Respondents fail to identify any specific provision of the PCLCD that the Carriers allegedly breached by supposedly subcontracting the reefer work. Accordingly, the Court cannot conclude that Respondents have valid breach-of-contract money damage claims against the Carriers that are independent of the § 10(k) decision.

Moreover, even if the PCLCD did contain a subcontracting provision similar to provisions present in the CBAs in *AGC*, *Hutter*, *Micron*, and *Carpenters Local 33*, the circumstances here would still not be analogous to the circumstances in the *AGC* line of cases. Here, the Carriers subcontracted with ICTSI to perform the reefer work. Unlike the subcontractors in the *AGC* line of cases, however, ICTSI (the subcontractor) is a party to the CBA (the PCLCD) between the general contractor (the Carriers) and the complaining union

(Respondents). Thus, even assuming that the PCLCD forbids the Carriers from subcontracting work to non-signatories to the PCLCD, the Carriers could not have breached that provision by contracting with ICTSI because ICTSI *is* party to the PCLCD.

Simply put, Respondents have failed to establish that their lost work opportunity grievances against the Carriers are based on a plausible breach-of-contract theory similar to the unions' breach-of-contract claims in the *AGC* line of cases. In the absence of a plausible breach-of-contract claim against the Carriers that is independent of the § 10(k) decision, it appears that Respondents' grievances against the Carriers are simply (or at least primarily) intended indirectly to pressure the Port and ICTSI to assign the reefer work to ILWU members. In fact, in response to Respondents' grievances, one carrier, Hanjin, sent an email to ICTSI and the Port demanding that they use ILWU members to perform reefer work. Dkt. 2-2 at 218-19. Section 8(b)(4)(ii)(D) is intended to prohibit this sort of conduct.

The Court recognizes that the legal principles developed in *AGC*, *Hutter*, *Micron*, and *Carpenters Local 33* are complex and nuanced. Moreover, the peculiar circumstances of this case may warrant either expansion or contraction of those principles. This Court, however, does not have jurisdiction to enter a final decision on whether Respondents' grievances against the Carriers violate § 8(b)(4)(ii)(D). That decision belongs to the NLRB. In the present decision, the Court must simply determine whether Petitioner is likely to succeed on the merits of his claims. The Court concludes that Petitioner is likely to succeed on his § 8(b)(4)(ii)(D) claim.

**2.      § 8(b)(4)(ii)(B)**

Section 8(b)(4)(ii)(B) provides that it is an unfair labor practice for a union "to threaten, coerce, or restrain any person engaged in commerce" where an object of the union's conduct is to force or require "any person to . . . cease doing business with any other person." 29 U.S.C.

158(b)(4)(ii)(B). Section (b)(4)(ii)(B) "only prohibits . . . so-called 'secondary' activity, not primary activity." *John B. Cruz Constr. Co., Inc. v. United Bhd. of Carpenters & Joiners of Am., Local 33*, 907 F.2d 1228, 1230 (1st Cir. 1990). The "distinction between primary and secondary activity depends upon the object of the union's picketing. If the object of the union's conduct is to put direct pressure on the employer with whom the union has a dispute, the conduct is primary and lawful. If, on the other hand, the primary object of the union's conduct, taken as a whole, is to bring indirect pressure on the primary employer by involving a neutral or secondary employer in the dispute, the conduct is secondary and prohibited." *Id.*; *see also Prod. Workers Union of Chicago & Vicinity, Local 707 v. N.L.R.B.*, 793 F.2d 323, 330 (D.C. Cir. 1986) ("secondary activity under Section 8(b)(4)(B) refers only to pressure on a neutral third party").

In *National Woodwork Manufacturers Association v. N.L.R.B.*, 386 U.S. 612 (1967), the Supreme Court carved out an exception to the prohibition on secondary activity. This exception is often called the "work preservation" doctrine. Under the work preservation doctrine, a union's activity that is "conducted for the sole purpose of preserving traditional unit work and directed at an immediate employer [is] not violative of section 8(b)(4)[ii](B) in spite of ancillary secondary effects." *Local 644, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. N.L.R.B.*, 533 F.2d 1136, 1147 (D.C. Cir. 1975). To qualify as lawful work preservation, the union's conduct must satisfy two tests:

> First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question—the so-called "right of control" test of [*N. L. R. B. v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of New York & Vicinity, Local Union No. 638*, 429 U.S. 507 (1977) ("*Pipefitters*")]. The rationale of the second test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement [or activity] has a secondary objective, that is, to influence whoever does have such power over the work.

*N. L. R. B. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 447 U.S. 490, 504-05 (1980). Thus, under the second prong, the "right of control" test, a union's activity performed with the object of preserving the union's work may nevertheless "violate § 8(b)(4)[ii][B] if the primary employer 'does not have control over the assignment of the work sought by the union.'" [6] *N.L.R.B. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 473 U.S. 61, 74 (1985) (quoting *Pipefitters*, 429 U.S. at 510-11).

Petitioner alleges that Respondents' pursuit of the § 301 claim and grievances against the Carriers violates § 8(b)(4)(ii)(B) because ICTSI and the Carriers are neutral employers and the object of Respondents' § 301 claim and grievances is to force ICTSI and the Carriers to cease doing business with the Port. Pet. at ¶ 8. Respondents do not contest Petitioner's allegation that their maintenance of the § 301 claim against ICTSI violates § 8(b)(4)(ii)(B). Respondents argue, however, that they may continue to pursue their grievances against the Carriers because the Carriers are not neutral employers and the object of Respondents' grievances is to preserve work that has traditionally been performed by their members. Opp'n to Pet. at 11-19.

The Court concludes that Petitioner is likely to prevail before the NLRB on the claim that Respondents' grievances against the Carriers violate § 8(b)(4)(ii)(B). Contrary to Respondents' argument, the Court finds that the NLRB is likely to conclude that Respondents' grievances are not lawful pursuant to the work preservation doctrine. The NLRB has already found, in its § 10(k) decision, that Respondents do not have a work preservation claim to the reefer work. The NLRB explained that "IBEW-represented electricians have been performing the disputed work since 1974. Where, as here, a union is claiming work for employees who have not previously

---

[6] The term "primary employer" should not be confused with primary or secondary activity. A work boycott against the primary employer may constitute an unlawful secondary boycott if the primary employer does not have the right to control the work at issue.

performed it, the objective is not work preservation, but work acquisition." *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *4.

Even assuming, however, that Respondents' activity has as its objective the preservation of work traditionally performed by ILWU members, thereby satisfying the first test required under the work preservation doctrine, Respondents would still fail to satisfy the right of control test. The question of which party in the present dispute has the right to control the reefer work has been decided twice before. In *Hooks v. Int'l Longshore & Warehouse Union, Local 8*, Case No. 3:12-cv-01088-SI (D. Or.), this Court determined that the Port of Portland controlled the reefer work. In addition, in its § 10(k) decision, the NLRB determined that the Port controls the reefer work. *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *6 ("the Port is the employer in control of the work in dispute").

Notwithstanding these decisions, Respondents cite to case law and e-mails sent from the Carriers to the Port and ICTSI and argues that the Carriers have the right to control the reefer work. Neither the case law nor the e-mails cited by Respondents warrant revisiting the conclusions already reached by this Court and by the NLRB that the Port, not the Carriers, controls the assignment of the reefer work. The principal case cited by Respondents is *N.L.R.B. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 473 U.S. 61 (1985) ("*ILA*"). Opp'n to Pet. at 15. In that case, the Supreme Court noted that "the longshoremen's employers, marine shipping companies, have the 'right to control' container loading and unloading work by virtue of their ownership or leasing control of the containers." *Id.* at 74 n.20. On the facts before the Supreme Court in that case, this may well have been true. *ILA*, however, was decided more than 25 years ago and on the basis of contractual agreements that have long since been superseded. This Court cannot rely on a statement in a 25-year-old case that was made on the basis of different facts and

different contracts to determine that the Carriers here have the right to control the reefer work at Terminal 6 today.[7]

The numerous emails sent from the Carriers to the Port and ICTSI also fail to establish that the Carriers have the right to "control" the reefer work. In those e-mails, the Carriers demand that ICTSI and the Port use ILWU members to perform reefer work. *See* Decl. of Robert Remar, Exs. A-F (Dkt. 22). Respondents contend that the e-mails establish that the Carriers control the reefer work. The Carriers' e-mails, however, merely establish that the Carriers believe that the PCLCD contractually requires ILWU to perform the reefer work. In fact, the Carriers may be correct that the PCLCD requires ICTSI to use ILWU members to perform reefer work. The e-mails do not establish, however, which party actually controls the assignment of reefer work at Terminal 6 at the Port of Portland. In its § 10(k) decision, the NLRB found that the Terminal 6 Lease and the DCTU Agreement provide that the Port controls the assignment of the reefer work. *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *5-6. The Port is not a party to the PCLCD and is not bound by the PCLCD's apparent requirement that ILWU members perform the reefer work. Accordingly, the Carriers have no power to assign Respondents the work they seek.

Because the Carriers lack the authority to assign the reefer work to ILWU members, Respondents' grievances against the Carriers cannot compel the Carriers to assign the reefer work to ILWU members. The "commonsense inference" to be drawn from this evidence is that, because the Carriers have no power to assign the reefer work to ILWU members, Respondents'

---

[7] At least one key difference between the present case and the circumstances in *ILA* is evident from the Supreme Court's statement alone. The Court stated that the "marine shipping companies" were "longshoremen's employers." In this case, however, the Carriers do not directly employ the ILWU members. Instead, the Carriers apparently contract with terminal operators, such as ICTSI, to perform work on the containers, and ICTSI, not the Carriers, employs the ILWU members.

grievances are tactically calculated to pressure the Carriers to cease doing business with the Port. *United Food & Commercial Workers Union Local No. 367*, 333 NLRB No. 84, 2001 WL 345201 (Apr. 4, 2001) ("The 'commonsense inference' to be drawn from all the record evidence is that, because QFC has no power to assign the work in controversy, the Respondent's grievance-arbitration was not addressed to the labor relations of the contracting Employer QFC vis-á-vis its own employees, but was calculated to satisfy union objectives elsewhere vis-á-vis Cinnabon."). Section 8(b)(4)(ii)(B) makes it an unlawful trade practice for a union to coerce, threaten, or restrain a neutral employer where the object of the union's conduct is to force or require the that neutral employer to cease doing business with another employer. The NLRB is likely to find, therefore, that Respondents have violated § 8(b)(4)(ii)(B) by filing lost work opportunity grievances against the Carriers.

**B.    Irreparable Harm**

Permitting an "allegedly unfair labor practice to reach fruition and thereby render meaningless the NLRB's remedial authority is irreparable harm." *Small*, 611 F.3d at 494 (internal quotation marks and citation omitted). In this case, Respondents' § 301 claim against ICTSI is continuing to cost ICTSI legal fees. In addition, Carrier Hanjin has threatened to pass along the cost of its legal fees defending Respondents' grievances to ICTSI. Dkt. 202 at 218-19. ICTSI states that if the Carriers hold ICTSI responsible for Respondents' grievances against the Carriers, ICTSI would "be forced, by economic necessity, to suspend or drastically curtail operations at the Terminal." Affidavit of Elvis Ganda, Dkt. 19-2 at 41. Respondents' grievances against the Carriers could also cause the Carriers to make the decision to bypass the Port of Portland. This could also seriously threaten ICTSI's ability to continue to operate. *See id.* at 40-41. ICTSI's only viable alternative to either of these scenarios would be to negotiate with the

Port to reassign the reefer work to ILWU members. That alternative, however, would render meaningless the NLRB's remedial authority. Given these choices, the Court concludes that Petitioner has established the likelihood of irreparable harm in the absence of a preliminary injunction.

**C.      Balance of the Equities and the Public Interest**

The balance of the equities tips sharply in Petitioner's favor. The only hardship Respondents face is delay in prosecuting a lawsuit that the NLRB will likely conclude is unlawful and delay in pursuing grievances seeking money damages against the Carriers that the NLRB will likely find to be unwarranted. Even if the NLRB were to conclude that Respondents' grievances against the Carriers are lawful, the delay pending the NLRB's decision will not "irreparably harm" Respondents. Respondents' grievances against the Carriers seek only money damages. If the NLRB were to decide that Respondents may pursue those grievances, the delay will not deprive Respondents of the ability ultimately to obtain the money damages they seek. As described above, the hardships faced by Petitioner are significantly more severe. ICTSI faces the possibility of no longer being able to operate at Terminal 6.

Further, a decision by the Carriers to bypass the Port of Portland would likely injure the local and regional economies and deprive many employees at Terminal 6 of the opportunity to work. In light of all of these potential consequences, the balance of equities and public interest sharply favors the granting of a preliminary injunction. *See Small*, 611 F.3d at 494-95 (union's delay in prosecuting lawsuit did not outweigh potential "disruption of industrial peace" caused by reassigning disputed work from one union to another).

## INJUNCTIVE RELIEF ORDERED

The Court concludes that Petitioner has satisfied each of the four *Winter* elements

required for the granting of a § 10(l) preliminary injunction. Moreover, even

if Petitioner did not fully demonstrate that he was likely to succeed on the merits of his claims,

the Court concludes that Petitioner has raised serious questions going to the merits of his claims

and the balance of equities tips sharply in his favor. Thus, Petitioner has established that the

Court should issue a preliminary injunction pursuant to both the traditional *Winter* test and the

Ninth Circuit's "serious questions" variation of that test. The Court, therefore, **GRANTS**

Petitioner's Petition for Preliminary Injunctive Relief, Dkt. 1, as follows:

Pending final adjudication by the NLRB of the pending administrative action above:

1.  Respondents International Longshore and Warehouse Union Local 8, International

    Longshore and Warehouse Union Local 40, and the International Longshore and

    Warehouse Union, their officers, agents, servants, employees, affiliated locals, attorneys

    and all members and persons acting in concert or participation with them be, and they

    hereby, are **ENJOINED** from filing, processing, maintaining, prosecuting, or threatening

    grievances or new lawsuits against ICTSI or the Carriers, including but not limited to

    Cosco North America, Inc., Hanjin Shipping America, LLC, "K" Line America, Inc.,

    Hapag Lloyd America Inc., or otherwise threatening, coercing, or restraining the Carriers,

    or any other person engaged in commerce, or in an industry affecting commerce, where

    in any case an object thereof is, in part, to: (i) force or require any of the Carriers or other

    persons to cease performing services for, handling, or otherwise dealing in the products

    of, and to cease doing business with, the Port of Portland; or (ii) to force or require the

    Port of Portland to assign the disputed work to employees who are members of, or

represented by, Respondents rather than to employees who are members of, or represented by, IBEW Local 48, or from engaging in any like or related conduct;

2. Respondents shall, within seven days, provide to each of their officers, representatives, employees, agents, affiliated locals, and members involved with work performed at Terminal 6 a copy of this Order and a clear written directive to refrain from engaging in any conduct inconsistent with this Order;

3. Respondents shall, within seven days, provide to each of the Carriers, as well as to the Pacific Maritime Association, a copy of this Order and a written notice signed by responsible officials of each Respondent. Such written notice shall state in substance the following:

> The undersigned represent that the International Lonshore and Warehouse Union and its Locals 8 and 40 will comply with the attached Order and will not engage in any conduct prohibited by §§ 8(b)(4)(ii)(B) and (D) of the Act, including, but not limited to, in any manner or by any means, including by filing, processing, maintaining, or threatening grievances or new lawsuits against ICTSI or other entities named above in paragraph 8(k), or otherwise threatening, coercing, or restraining ICTSI, or any other person engaged in commerce, or in an industry affecting commerce, where in any case an object thereof is to: (a) force or require the Port to assign the disputed work to employees who are members of, or represented by, Respondent International, Respondent Local 8, and/or Respondent Local 40, rather than to employees who are members of, or represented by, the International Brotherhood of Electrical Workers ("IBEW") Local 48; or (b) to force or require the Port to assign the disputed work to employees who are members of, or represented by, Respondent Local 8 and/or Respondent Local 40, rather than to employees who are members of, or represented by, IBEW Local 48.

4. Respondents shall within fourteen days of the issuance of this Order file with the District Court and serve a copy upon the Petitioner, a sworn affidavit from a responsible official that describes how it has complied with the terms of this Order.

IT IS SO ORDERED.

Dated this 21st day of November, 2012.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge